I think the penultimate issue before this court in this case is whether the cited combination of prior art references genuinely discloses or suggests every claimed feature as required by each of the pending claims. We believe the answer is no. I hope to establish the following three points. The critical prior art document cited is a pharmacopoeia disclosure, an excerpt from the pharmacopoeia that sets multiple general safety standards for all parental products. All products are intended to be injected into a patient rather than administered by another mode. There are hundreds or thousands of treating agents, treating agent formulations designed for injection to a patient for one reason or another. Our second point is that the specific claims, the pending claims at issue, all require a specific narrow combination among a few other elements in the claims. They all require treatment, a container of treatment where the treating agent is one of a small specific class of treating agents and they also require that extractable zinc from the closure be zero parts per million. The pharmacopoeia, the general disclosure is five parts per million as a safety measure. And our third point is that nothing in the combined disclosures of the prior art genuinely suggests the specific claim combination. The prior art discusses a safety limit of five parts per million of extractable zinc from rubber closures for these types of containers. The claims require for specific treating agents for acid labile proton pump inhibitors of which Pantoprazole is one. The extractable zinc should be zero parts per million. But the reference is disclosure of five parts per million as a safety limit encompasses zero parts per million. We would disagree with that, sir. Safety limit says that you cannot exceed five parts per million. Not only does the pharmacopoeia not teach you how to achieve the five, it doesn't discuss less. All it says is that anything higher than five is no good. There's nothing that affirmatively teaches or discloses even five, let alone anything less. So, for example, there are three cases cited for ranges. In Ray Peterson and Ray Howard. We're not talking about anticipation, we're talking about obviousness. So the question is, is this statement of a limit of teaching on an ordinary skill in the art would understand encompasses. Obviously, it encompasses things that are less than five parts per million. It's an upper limit. And even in your argument, you point out fairly clearly that even the recitation zero part per million, it's really not zero. Right. And in fact, the specification defines zero parts per million as no detectable amount of zinc. The critical point, though, is that the combination, the particular combination of this family of treating agents with zero as opposed to the pharmacopoeia's limit of five, the application itself points out that that gives us an unexpected result. What is it about that combination that provides this unexpected result? As far as understanding why it works, I'm not sure. But what happens is with acetabol proton pump inhibitors, the inventors found and it's in the appendix in the application at pages 18 and 19, the inventors found that surprisingly by using the closure container system, which essentially does not release zinc ions, then in Pantoprazole and related injections... What are you reading from? I'm sorry. Appendix, page 18, the third paragraph starts surprisingly. Thank you. And it says in the formation of particles can be suppressed or completely avoided. So even more than the general limit, the pharmacopoeia sets forth a general limit for all Pantoprazole products and the general limit for zinc is five parts per million. Anything higher than that is not permitted, is not deemed safe. It's a maximum of five parts, correct? Yes, sir. It has to be no higher than five. So one part per million wouldn't satisfy you? Yes. So you would say that's within the range, one, two, three, four, not zero? Right. And if our claims went to all parenteral products and simply lowered the amount of zinc, I would agree that that's significant. But there's nothing in the record that points to zero parts per million as having special significance with this particular treating agent family. All the claims require that the treating agent be an acid labile proton pump inhibitor. But wouldn't a person skilled in the art say, well, if one part satisfies it, let me try zero? Well, I understand and there's certainly an initial attraction to that type of an argument. But for example, the Pharmacopeia generally, well, it seems like a practical step. Well, except that I would point out that even in the two pages of the Pharmacopeia that are cited in the appendix of 495 to 496, even with regard specifically to rubber closures for acreage parenteral preparations, the Pharmacopeia sets forth a number of limitations, a number of safety limitations. It deals with the elasticity of the closure, it deals with solubility, acidity, absorbance, the presence of reducing substances, there's a whole slew of issues even just specifically for this one factor. And obviously when you're talking about a treating agent solution, the nature of the rubber closure is only one small part of the whole picture. You've got the container, you've got the closure, you've got the needle that's going to be involved, you've got what goes into the solution, and even still, even as far as contaminants, the Pharmacopeia talks about impurities, ammonium is limited to two parts per million, extractable heavy metals are limited to two parts per million, volatile sulfides is limited against a standard solution, and then there's the extractable zinc at five parts per million. We're saying, the inventors are claiming that this particular combination, zero parts per million of zinc, that one combination with these particular treating agents makes a difference. And frankly, when you take it in context, that's one limitation out of a slew of limitations for the rubber stoppers, and it's of course one of even myriad other sets that this applies to when you're looking at all formulations, all kinds of treating agents. So that leads to the third point, our position is that nothing in the combined disclosures genuinely teaches this combination, it's a very specific combination in the claims, requires an acetyl-A-viol proton pump inhibitor and zero parts per million, no detectable amount of zinc. And the application itself also goes on to explain that that was an unexpected result, that if you limit that particular parameter in the solution, in the closure of the solution, that that particular parameter is enough to typically avoid precipitate in the solution. Thank you. Okay. Ms. Caprion, correct? Good morning, Your Honors, may it please the Court. Here substantial evidence supports the Board's finding that Lippert's claimed closure, which discloses a, which basically discloses a made of material where there's zero parts per million of extractable zinc, as determined by the European Pharmacopeia, is obviously not a standard that is set forth in that pharmacopoeia itself. And as Your Honors acknowledged, the pharmacopoeia sets a standard of no more than a maximum of five parts per million of extractable zinc. Now what this discloses is a range of allowable extractable zinc within the closures, and that range encompasses the range that is claimed in this claim. Sometimes the, let's call it a presumption of picking something within a previously disclosed range can be overcome. What is the kind of evidence, I know you think that there wasn't sufficient, but what is the kind of evidence that the applicant here should have tried to come up with that might have overcome that presumption? Well, a case law makes clear that when you are claiming a specific point within a disclosed range or within a taught range, what you have to show is criticality of that point. Yeah, I will say I've never understood what that means in a concrete way. That's kind of my question. What does it mean to be critical here? So in this case, Lipper could have submitted data showing that the particular combination here of the pharmaceutical product as well as having no detectable zinc greatly increased or rather greatly reduced the number of particles in solution. Because that's really, at the end of the day, that's what they're saying, that this surprising event is what's taught here. So in order for them to actually overcome that... Doesn't the application at the pages we were talking about before, I guess, Joint Appendix 18 and 19, say that by doing this you can reduce or eliminate formation of certain kinds of undesirable particles? At APPX18, what the inventor says is that it was surprising that this event occurs. But what Lipper has to show here is that not only was it surprising that this event occurred, but that it was surprising within the scope that's taught in the prior art as well as within what's claimed. And here what's taught in the prior art is that it is preferable to have five parts per zinc. And the reason that's preferable is because the Pharmacopeia standard sets forth standards to not only improve the safety of the closures that are contained within these parenteral pharmaceutical products, but also to protect the actual pharmaceutical product that's contained within. And what it taught was that it's preferable not to have contaminants go from the closure to the pharmaceutical product that's contained. And so, because that is taught within the prior art, it is not inventive to discover a particular value within that disclosed range where they haven't shown that at five parts per million of extractable zinc, the amount of particles and product is significantly more than at zero parts per million of extractable zinc. Did they make any kind of case of no reasonable expectation of success? I guess I heard an echo of that in the suggestion that even the European Pharmacopeia didn't teach you how to do the five, let alone how to get significantly below that. Before the board, they did raise that argument that there was no reasonable expectation of success here. But what the board and the examiner found is that the European Pharmacopeia itself teaches the testing that's used to determine whether or not a closure actually meets those limitations. And so, because the European Pharmacopeia teaches one of skill in the art what tests to use to determine whether a particular closure meets the five parts per million of extractable zinc limit, it would also teach whether or not a particular closure had no detectable zinc here. And so, what the board found is that there was a reasonable expectation of success. Does the Pharmacopeia reference teach the benefit of eliminating particle formation through by reducing the zinc? What it does teach is that by limiting the amount of contaminants, you actually promote the safety and reduce the toxicity of the pharmaceutical product contained therein. And that's taught at page 495. But, you know, that's not the only prior art here of record. The other prior art also teaches that it is preferable to reduce the amount of contaminants that go from the disclosure into any pharmaceutical products that contain within the containment closure system. If there are no further questions. Could I just actually follow up on something? I may well be confused at the moment. The following two things do not seem to me logically equivalent. One is, if I give you something, you know how to test how much zinc is in it. And the other is, I know how to make something with a particularly low level of zinc. And isn't the reasonable expectation of success inquiry the latter and therefore not answered by saying, here's a test that can tell you how much zinc there is? Well, I think first we have to look back and see what is claimed here. And what is claimed is a closure that is made of material with zero parts per million of extractable zinc. And that closure that they have disclosed in their application is not made of any particular material. They've disclosed various different embodiments, but those embodiments are taught in the prior art. And so it's not inventive to discover that a particular point within this range that's disclosed within the pharmacopeia would have these beneficial properties. And second, what is claimed here is a closure where it's zero parts per million as determined by the European pharmacopeia. And the European pharmacopeia discloses the test that one would use to determine whether a particular closure has zero parts per million of extractable zinc. But if you still couldn't make it, doesn't that, I mean, I guess I'm still not hearing you say prior art taught you how to get a closure down around the zero. Well, the prior art recognized that it is preferable to reduce the amount of contaminants that could flow from the closure into the pharmaceutical product. That's clear. That's taught by Meraki. That's taught by Lippert. And Meraki actually discloses one of the embodiments disclosed in Meraki is a sealed closure. And the objective of Meraki, and I think that's, let me point that to you, if you turn to page 488 of the appendix, and you look at, well, if you look at the figure on page 487, it shows a stopper and it shows a laminated layer of the stopper. And then at 488, one of the objectives or one of the problems that they were trying to overcome in the prior art was they wanted to reduce the contamination that takes place due to fine particles from the rubber materials during production steps of storage and medicants. So they didn't want any fine particles falling from the rubber closures into the pharmaceutical product contained therein. So the prior art recognized that this was a problem. This is not a new problem. And the prior art also recognized ways to achieve that, or ways to solve that problem. Another, I think another also telling thing here is that within the inventor's specification, they disclosed various embodiments that would encompass this invention. And at APPX, I believe it's 19, APPX 19, it's the invention, inventor's disclosure, or specification rather, and they talk about various types of closures that would meet the claimed invention. And one of the embodiments they disclosed is a type one rubber closure as according to the European Pharmacopeia itself. About 10 lines up from the bottom. Correct. And that type one closure, and that type one closure would meet the strictest requirements of the European Pharmacopeia. And yet another, I think another telling thing is that in their reply brief at page 10, the Lippert in fact concedes and acknowledges that there were options available that would likely produce closer to zero parts per million of extractable zinc. So not only is this taught in the prior art, but appellants here concede that it would not be difficult to do. Any questions? If there are no further questions, I yield. Okay, thank you. Mr. Pleasant? Yes, sir. At page 19 of the appendix, in the section that was just being discussed, the claims focus on zero parts per million. The disclosure discusses less than five, less than four, less than three, less than two, less than one. The claims are the most preferred embodiment and the strictest of these in order to most minimize the risk. and avoid detectable amounts of zinc. Zero is the only one that's defined as a non-detectable amount of zinc. So does your written description enable zero? Yes. There are... I mean, it seems to me there are only two possibilities. Yes, sir. It enables it. One is you say, here's something new, nobody did before, and it's zero. And the other is something off the shelf, zero. The point isn't that it's a new closure necessarily. The point is that... I mean, first off, for example, Meraki itself, they use a laminated closure. But the closure itself, if you look at Meraki in appendix 492, the rubber itself is made using a zinc compound. So when you insert a needle through that closure, without being tested, there's no way to know whether any zinc can still leach through the hole that's made by the needle, or that may come out, maybe enter into the solution when the needle is inserted. The specification has a broad range, but the claims focus on zero. And the important thing is not so much that the stoppers are new. I mean, if you use a stopper that simply is produced without any zinc in the process, then there can't be any zinc. The key here is recognizing that reaching the zero parts per million, which is more expensive and not typical in the industry, but reaching zero parts per million of zinc with this particular set of treating agents, not minimizing the... You don't have to worry about the other factors that the pharmacopoeia sets forth. You don't have to worry about... But for this particular set of treating agents, zero detectable zinc makes a difference. And our position is not that we're combining... That we created something new with the closure, but it's this particular combination with the specific, very narrow set of treating agents makes a difference. And that's what was not known or disclosed in the prior argument. Thank you. We thank you very much for your argument.